IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.

MARK C. BUTTERFIELD,

      Plaintiff,

vs.

JETBLUE AIRWAYS CORPORATION, a
foreign for-profit corporation,

      Defendant.

_____/

## COMPLAINT AND JURY TRIAL DEMAND

    Plaintiff MARK C. BUTTERFIELD. through undersigned counsel, sues Defendant JETBLUE AIRWAYS CORPORATION, a foreign for-profit corporation, and alleges as follows:

    1.    This is an action for unlawful retaliation in employment in violation of the Florida Whistleblower Act, §448.101, *et seq.*, Fla. Stat. ("FWA"), in which Plaintiff seeks damages in excess of $15,000.00, exclusive of interest, costs, and attorney's fees.

    2.    Plaintiff was at all relevant times, and still is, a resident of Broward County, Florida, and was at all relevant times, and still is, *sui juris*.

    3.    Defendant was at all relevant times, and still is, a foreign for-profit corporation operating a commercial airline flying domestic and foreign routes, including routes out of Fort Lauderdale-Hollywood International Airport in Broward County, Florida. At all times relevant hereto, Defendant was authorized to do business, and is still doing business, in Broward County, Florida.

4.      Plaintiff was employed by Defendant as a flight attendant from July 24, 2004 until November 5, 2018, when his employment was involuntarily terminated.   At the time he was terminated, Plaintiff was stationed with Defendant flying out of Fort Lauderdale-Hollywood International Airport in Broward County, Florida.

5.      On August 15, 2013, Plaintiff filed suit against Defendant in Broward County Circuit Court in a case styled *Mark C. Butterfield v. JetBlue Airways Corporation,* Case No. 13-019046 ("*Butterfield I*").  In this lawsuit, as reflected in Count I of the operative Second Amended Complaint attached hereto as Exhibit "A", Plaintiff claimed that Defendant violated the FWA, specifically Fla. Stat. §448.102(3), for, among other things, engaging in various retaliatory personnel actions against Plaintiff based on his objections to and refusal to participate in certain federal aviation safety regulation violations by Defendant, including 14 C.F.R. §§91.13, 121.133, and 121.135.

6.      Plaintiff, through his attorney, Michael Moulis, Esq., actively and aggressively litigated the lawsuit and engaged in discovery, including the taking of depositions.  The depositions included that of Wendy Iglesias which took place on August 21, 2018, and at which time Plaintiff was still employed by Defendant.  During the deposition, Mr. Moulis presented the deponent with the front page of a flight manifest for the specific flight that was at issue in *Butterfield I* to demonstrate that the deponent was actually on the subject flight when she was claiming that she had not been, and thus that her testimony was untruthful.  In response to Mr. Moulis' use of the document as an exhibit in the deposition to impeach the witness, the attorney representing Defendant in the deposition, Arlene Kline, Esq. of the law firm of Akerman LLP, angrily inquired of

Mr. Moulis off the record where he had obtained the document and then made the statement that JetBlue intended to fire Plaintiff and would find a reason to do so.

7.      In the early morning hours of September 20, 2018, Plaintiff received a call from a member of Defendant's Human Resources department, Tobias Bushway.  Mr. Bushway informed Plaintiff that he needed to discuss with Plaintiff his possession of the document which Mr. Moulis had used in the deposition he had taken of Ms. Iglesias. Plaintiff truthfully responded to Mr. Bushway that he was not in possession of the document.

8.      After speaking with Mr. Bushway, Plaintiff the same day called his attorney, Mr. Moulis, about what had transpired.

9.      On October 12, 2018, at approximately 4:30 a.m. while he was preparing to work a flight for which he had been scheduled, one of Defendant's in-flight supervisors, Carol Darrow, approached Plaintiff, pulled him off the flight, and ordered him to come with her to meet with Defendant's Fort Lauderdale Human Resources Field Generalist, Marilyn Mendez.  In the meeting, Ms. Mendez falsely claimed that Mr. Bushway had been trying to contact Plaintiff and that Plaintiff had failed to return his calls.  Ms. Mendez then, in an intimidating fashion and repeatedly and condescendingly referring to Mr. Moulis as "your attorney", informed Plaintiff that Defendant was conducting an investigation and that Ms. Mendez intended to ask him questions in connection therewith.  Ms. Mendez showed Plaintiff the rule from the "Crewmember Blue Book" that he was required to cooperate in any internal investigation or be subject to discipline "up to and including separation."  In response, Plaintiff repeatedly informed Ms. Mendez that he wanted to cooperate in the investigation, but her questioning would

involve his ongoing litigation and upon the advice of his counsel, Mr. Moulis, he was not at liberty to discuss the matter.  Plaintiff then offered to give Ms. Mendez Mr. Moulis' contact information and also requested of Ms. Mendez that Mr. Moulis be allowed to be present during the questioning, but Ms. Mendez refused both requests.  Plaintiff then inquired of Ms. Mendez if he could first call his attorney to discuss the matter with him, to which Ms. Mendez agreed.  However, Ms. Mendez took the opportunity at the time to tell Plaintiff that he "understood" that he was not cooperating in the internal investigation.

10.     Plaintiff then contacted Ms. Moulis the same day to discuss the situation and to secure his advice on how to deal with it.  As a result of that discussion, Plaintiff attempted twice the same day to call Ms. Mendez to discuss his position but both calls to Ms. Mendez went into Defendant's voicemail system.  Thereafter, and still on the same day he had first met with Ms. Mendez – October 12, 2018 – Plaintiff sent an email to Ms. Mendez, a copy of which is attached as Exhibit "B", in which he informed her of what Ms. Kline, Defendant's attorney, had said during the deposition of Ms. Iglesias, that he intended to cooperate in Defendant's internal investigation he had first learned about that morning "in accordance with JetBlue policy", and that he viewed the investigation of the matter which was involved in his ongoing litigation as both retaliatory and illegal.

11.     Plaintiff did not hear back from Defendant regarding his email to Ms. Mendez or the situation until Ms. Darrow informed him on October 18, 2018 that he was suspended from his employment with Defendant regarding his purported failure to cooperate with Defendant in its internal investigation.  Thereafter, on October 18, 2018, Plaintiff sent an email to Ms. Mendez, Ms. Darrow, and Jeffrey Austin, his Inflight Team

Leader and direct supervisor, regarding the events that had led up to his suspension. A copy of Plaintiff's October 18, 2018 email is attached as Exhibit "C".

12.     By a subsequent email dated October 18, 2018, Ms. Mendez confirmed Plaintiff's suspension for not cooperating in the investigation "pending an employment review". In that email, a copy of which is attached as Exhibit "D", Ms. Mendez confirmed that the action being taken against Plaintiff was for his failure to cooperate in the investigation and his refusal to answer her questions. Significantly, Ms. Mendez nowhere mentioned Plaintiff's email to her sent on October 12, 2018 in which he agreed to cooperate in the investigation and also complained that her actions were considered retaliatory and illegal.

13.     By letter dated November 5, 2018 from Mr. Austin, a copy of which is attached as Exhibit "E", Plaintiff was informed that he was being "separated" – i.e., terminated – from his employment with Defendant "for Violation of Company Policy".

14.     Significantly, from the time Plaintiff sent his October 12, 2018 email to Ms. Mendez complaining that her actions were both illegal and retaliatory until the date of his termination, Defendant, in contravention of Defendant's legal obligations and its own internal personnel policies and procedures, had failed to conduct any internal investigation into, or take any remedial action as to, Plaintiff's reported claims of retaliation and illegal conduct engaged in by Ms. Mendez.

15.     Plaintiff has satisfied all conditions precedent to the bringing and maintenance of this case.

16.     Plaintiff has hired the undersigned law firm to represent him in this case and has agreed to pay the firm a reasonable fee for its services.

17.     Plaintiff is entitled to recover his reasonable attorney's fees as part of his costs pursuant to the FCRA.

## COUNT I – UNLAWFUL RETALIATION IN VIOLATION OF THE FWA

18.     Plaintiff re-alleges paragraphs 1 through 17 as if set forth fully herein.

19.     The FWA makes it unlawful in §448.102(3), Fla. Stat., for an employer to retaliate against an employee who has objected to any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

20.     Plaintiff engaged in protected activity under the FWA when he filed suit and actively litigated his claims under the FWA as set forth in Count I of his Second Amended Complaint in *Butterfield I*.  At the time he was actively litigating his case, including the taking of the deposition of Ms. Iglesias by Mr. Moulis, Plaintiff had the good faith belief that Defendant was not only in violation of certain federal aviation regulations, but that he had also been retaliated against for objecting to those violations in violation of the FWA and in actively pursuing his lawsuit for violation of the FWA.

21.     Plaintiff also engaged in protected activity under the FWA when he, both verbally in his October 12, 2018 meeting with Ms. Mendez and via his October 12, 2018 email to Ms. Mendez, objected to Defendant's and Ms. Mendez's actions in intimidating and threatening him with discipline and termination in order to force him to discuss his ongoing litigation and the documentary evidence his attorney used therein without the presence or involvement of his attorney.  Such actions by Ms. Mendez and Defendant in the October 12, 2018 meeting were unlawful retaliatory personnel actions in violation of the FWA and also constitute unlawful and criminal witness intimidation, harassment and tampering in a non-criminal proceeding in violation of §914.22, Fla. Stat.

6

22.     Defendant, through Ms. Mendez, Ms. Darrow, and Mr. Austin, as well as other employees of Defendant who are presently unknown, acting in the course and scope of their employment with Defendant, engaged in unlawful retaliation in violation of the FWA by first suspending Plaintiff without pay and then terminating his employment. Defendant also retaliated against Plaintiff by not investigating and/or remediating his internal claims of retaliation and illegality as set forth in his October 12, 2018 email to Ms. Mendez.

23.     Defendant's reasons given for the suspension and termination decisions were pretextual as Plaintiff had informed Ms. Mendez in writing, the same day he had been asked to cooperate in the investigation and a full week before his retaliatory suspension, that he had agreed to cooperate in the investigation and would answer Ms. Mendez and Defendant's Human Resource's questions, although he believed that the investigation and the intimidation tactics that were employed were both illegal and retaliatory.   Notwithstanding his agreement and willingness to cooperate in the investigation the same day he was asked to cooperate, Plaintiff was terminated for not cooperating in the investigation.

24.     Plaintiff is entitled to recover his reasonable attorney's fees per the FWA, §448.104, Fla. Stat.

WHEREFORE, Plaintiff demands judgment against Defendant for the following relief:

A)     A declaration that Defendant engaged in unlawful retaliation in violation of the FWA;

B)     An award of lost back pay and lost benefits;

C)      An award of front pay for a reasonable period into the future if the remedy of reinstatement is not feasible;

D)      An award of all compensatory damages, including damages for emotional distress, humiliation and loss of dignity;

E)      An award to compensate Plaintiff for the adverse tax consequences of any back pay and compensatory damages awarded;

F)      An award of all interest;

G)      An award of all expenses and taxable costs;

H)      An award of reasonable attorney's fees; and

I)      Any further relief the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury of all issues so triable.

DATED:  March 3, 2020.

<div style="margin-left:40%">

RODERICK V. HANNAH, ESQ., P.A.
Attorneys for Plaintiff
8751 W. Broward Blvd., Ste. 303
Plantation, Florida 33324
Telephone:  (954) 362-3800
Facsimile:   (954) 362-3779
Email:  rhannah@rhannahlaw.com

By____/s/ *Roderick V. Hannah*_____
    Roderick V. Hannah
    Fla. Bar No. 435384

</div>

# EXHIBIT "A"

IN THE JUDICIAL CIRCUIT FOR THE
17TH JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CIVIL DIVISION

CASE NO: 13-019046

MARK C. BUTTERFIELD,

      Plaintiff,

v.

JETBLUE AIRWAYS CORPORATION,

      Defendant.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, MARK C. BUTTERFIELD, by and through his undersigned counsel files this Complaint against the Defendant, JETBLUE AIRWAYS CORPORATION., and states the following:

## JURISDICTION, PARTIES, AND VENUE

1. This is an action for monetary damages in excess of Fifteen Thousand Dollars ($15,000.00) to redress the depravation of rights secured by the Plaintiff, MARK C. BUTTERFIELD, pursuant to the Florida Whistleblower's Act of 1991, §§ 448.101-448.105, Florida Statutes (2001), specifically, F.S. Sec. 448.102(1) and (3).

2. Plaintiff, MARK C. BUTTERFIELD, (hereinafter "Plaintiff") is a resident of the State of Florida.

3. Defendant, JETBLUE AIRWAYS CORPORATION, (hereinafter "Defendant") is a foreign corporation authorized to do business in the state of Florida.

4.  Venue is proper in this jurisdiction since the incident took place in Broward County, Florida at the Fort Lauderdale International Airport.

5.  All condition precedents have been accomplished and any condition precedents not complied with has been waived.

## STATEMENT OF FACTS

6.  The Plaintiff was and is currently employed as a Flight Attendant with Defendant since 2004.

7.  On or about February 13, 2012, the Plaintiff, as an employee of Defendant performing required duties during the boarding process, encountered erratic behavior from a passenger.

8.  The passenger was observed exhibiting peculiar and otherwise bizarre behavior to the point where it disrupted the boarding process and interfered with several crewmembers' duties.  This behavior was peculiar enough that passengers and crewmembers viewed her as a threat to their safety.

9.  The behavior escalated where the Plaintiff recommended that it was necessary in the interest of safety to remove the passenger from the aircraft. The passenger believed it was the Plaintiff that ultimately caused her removal and repeatedly threatened Plaintiff as she was being removed.

10. The passenger was removed from the aircraft by Defendant's "Blue Watch" Security personnel and was prohibited from flying on that flight, by and through, the authority of the aircraft's Captain, Larry Toigo and ratified by the Defendant.

11. The Plaintiff and Captain Larry Toigo filed an In-flight Irregularity Report ("IIR") to the Defendant regarding the incident with the erratic passenger.(*See* **Exhibit "A"**)

12. On or about March 23, 2012, approximately one month later, the Plaintiff, while working JetBlue Flight 376, observed the aforementioned erratic passenger boarding the flight. The Plaintiff informed the Captain and other crewmembers of the passenger's prior safety violations and requested consultation with Jet Blue Security.

13. In speaking with Jet Blue Security, the Plaintiff specifically requested and inquired information of the rules, regulations, and policies concerning the criteria used to permit a previously denied passenger to re-board notwithstanding the prior illegal behavior.

14. The Plaintiff was not informed that the Defendant's "Blue Watch" Security Team had cleared the passenger (whom had threatened the Plaintiff multiple times) to fly since her removal on February 13, 2012.

15. The Defendant, The FAA, and DHS all have rules regulations and procedures for unruly passengers similar or identical to the aforementioned illegal behavior.  For whatever reasons, the Defendant failed to follow any procedures to determine whether the passenger's behavior would permit her to fly on any future flights.

16. The Plaintiff was further advised by Jet Blue's Security to either 1.)Walk off the job 2.) Fly with the previously unruly passenger and see if anything happens, or 3.) Have the passenger removed with assurance of repercussion in disciplinary action. The passenger was permitted on the March 23, 2012 flight, despite

3

Plaintiff's objection and the passenger's threats to his immediate safety on February 13, 2012.

17. In response to the passenger being permitted to board the March 23, 2012 flight, Plaintiff further objected to the Defendant's activity by switching positions with another flight attendant on board. This placed Plaintiff at a location on board farther away from the passenger in order to avoid confrontation.

18. On or about March 26, 2012, the Plaintiff met with JetBlue's Base Manager, Debra Heslin (herein after referred to "Heslin") for proper guidance in his concern for safety regarding to the incident with the passenger.

19. The Plaintiff questioned Heslin for further guidance of the Defendant's policy and procedures in regards to removal of a passenger and a passenger threatening a crewmember. No accurate or relevant answer was divulged, as she did not know these vital answers and had to seek higher counsel. Heslin further suggested completing a safety report. However, the safety report submitted by the Plaintiff was rejected and remanded determining the incident pertains to an "In-flight Irregularity Report".

20. The Plaintiff contacted Heslin to pursue answers to the aforementioned safety concerns. Heslin confirmed that the Plaintiff's direct supervisor, Giovani Quintero, ("Quintero"), could answer his inquires. Heslin facilitated a meeting date on April 6, 2012 on behalf of Quintero and the Plaintiff.

21. On or about April 6, 2012, the Plaintiff and Quintero entered into a closed-door meeting. The Plaintiff was under the strict belief that answers to his inquiries were available. Immediately, Quintero placed the Plaintiff on a conference call with Jet

Blue's Human Resources, Alfred Alvarez. The Plaintiff was notified that he was being removed from duty with pay, along with pay protection, and was assured that he was still in good standing with Defendant; the Plaintiff never had any delinquency, discrepancy or reprimand in the eight (8) years of employment with Defendant.

22. Further, Plaintiff was to be evaluated by a third party with regards to his "fitness for duty" and "ability to work in a safety related work environment". The Defendant stated that the cause of removal of duty was consequential of "letters of concern" written about Plaintiff that circulated throughout Jet Blue via e-mail. (*See* **Exhibit "B"**) In addition, Plaintiff would be promptly reinstated after completion and clearance of the evaluation.

23. The Plaintiff complied with the "fit for duty" evaluation with a third party independent contractor, Dr. Thomas Faulkner, who received copies of the "letters of concern" and furnished them to the Plaintiff. The Plaintiff was emotionally stricken of the personal evaluations of him through his peers and supervisory staff.

24. Pursuant to the "fit for duty" evaluation, Dr. Faulkner was to administer a bodily health related evaluation on the Plaintiff. Additionally, Dr. Faulkner furthered his expertise in referring Plaintiff to Psychiatrist, Dr. Rafael Perez; Dr. Perez also was in receipt of the "letters of concern".

25. The psychoanalysis evaluation demanded, by and through Defendant, was excessive due to Plaintiff having to re-live mental and emotional traumatic experiences throughout his life, which should not have been indulged in any way,

shape, or form by the Defendant, as the Plaintiff attempted to justify that he was

"fit for duty" and disprove the "letters of concern".

26. On or about April 16, 2012, Plaintiff attempted to address the "letters of concern"

and employment status with Defendant's Legal Team, Human Resources Alfred

Alverez, Defendant's Base Manager Debra Heslin and Supervisor Giovani

Quintero. The Plaintiff further attempted contact with Dr. Faulkner for concern of

his "fit for duty" evaluation. Communication ceased, hindering the Plaintiff's

knowledge of employment and mitigation to his livelihood.

27. On or about June 9, 2012, as a direct result of the Plaintiff's removal from duty

pursuant to the "fit for duty" evaluation, Plaintiff was unable to access JetBlue

web sites, his work e-mail, his company insurance information and his online

system, which allows his employment and benefits to be effective and continuing.

28. The Plaintiff's JetBlue ID card was deactivated at this time and was forbidden to

wear his uniform. The Plaintiff was never formally terminated from his

employment with Defendant. The Plaintiff purely relied on Defendant's

cooperation, support, and effectiveness in this tedious process for reinstatement of

his livelihood.

29. After over a year off duty, the Plaintiff was allowed to return to work in June

2013, with no direct explanation of the tremendous burden placed upon him to the

detriment of his livelihood and employment as of this current date.

30. As a direct result of the Defendant's actions the Plaintiff was forced to mitigate

for all losses, incurred accelerated indebtedness, loss in standard of living,

dramatic loss of benefits, deprived in enjoyment of life, and mental anguish.

## COUNT I – FLORIDA WHISTLEBLOWER ACT

## FLORIDA STATUTE 448.102(3)

### A.  THREATING AND INTIMIDATING A FLIGHT CREWMEMBER

31. The Plaintiff repeats and re-alleges paragraphs 1 through 30 stated as if set forth in full.

32. The Plaintiff expressed his objection to the Captain, the Defendants security team, and by switching job assignments to the erratic passenger boarding the March 23, 2012 Jet Blue flight.

33. The Plaintiff notified the Defendant in writing on two (2) occasions of the erratic passenger threatening him. (*Id.* **Exhibit "B"**) The passenger was in violation of Federal Aviation Administration Regulation § 91.11 and Code of Federal Regulation Title 14 § 121.580 prohibiting any person to threaten, intimidate, or interfere with a crewmember and their duties aboard an operating aircraft.

34. The first notice in February 2012 gave the Defendant reasonable and adequate time to cure the passenger's regulatory violation to the Plaintiff prior to the passenger's March 23, 2012 boarding.

35. The Defendant engaged in retaliatory personnel action in suspending the Plaintiff guised as a "fit for duty" evaluation and encumbering him with an approximate $1,800 garnishment of wages upon his return (*See* **Exhibit "C"**).

### B.  CARELESS AND RECKLESS OPERATION OF AN AIRCRAFT

### (GROSS DISREGARD FOR SAFTEY)

36. The Plaintiff repeats and re-alleges paragraphs 1 through 35 stated as if set forth in full.

37. The Defendant had engaged in conduct that shows disregard for foreseeable consequences.

38. The Plaintiff, as well as the Defendant's Captain Larry Toigo, identified the passenger as erratic, unfit to fly, and in violation of FAA Regulation § 91.11 and 14 C.F.R. § 121.580 in her threats to the Plaintiff.

39. The passenger's conduct and threats warranted her prompt removal to protect the safety interest of the passenger herself and the Defendant's passengers and crewmembers. The Defendant was in violation of the Code of Federal Regulation § 91.13 which prohibits the operation of an aircraft in a careless manner as to endanger the lives and property of another.

40. The Defendant showed blatant disregard for the safety for their passengers, their crewmembers, the Plaintiff, and the passenger herself in allowing her to board the March 23, 2012 Jet Blue flight without a safety resolution, and documentation thereof, owed to the Plaintiff and their security team.

41. The first notice in February 2012, ("IIR") gave the Defendant reasonable and adequate time to cure the passenger's regulatory violation to the Plaintiff prior to the passenger's March 23, 2012 boarding.

42. The Defendant engaged in retaliatory personnel action in suspending the Plaintiff guised as a "fit for duty" evaluation and encumbering him with an approximate $1,800 garnishment of wages upon his return (*Id.* **Exhibit "C"**)..

C.  DETERRENCE OF FAA APPROVED FLIGHT MANUAL

43. The Plaintiff repeats and re-alleges paragraphs 1 through 42 stated as if set forth in full.

44. As the Plaintiff met with Heslin, she clearly stated that she did not have answers to vital and important safety concerns. Further, she then confirms that she "cannot guarantee his safety" in her "Letter of Concern".

45. The Defendant owes a duty to protect the safety of all passengers and crewmembers in accordance with state and federal law.

46. The Defendant is in violation of Title 14 Code of Federal Regulations §§ 121.133, 121.135, which the Defendant is to keep a current manual for the use and guidance of avionic operations and include instructions and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety.

47. The Plaintiff's second notification in March 2012 ("IIR") gave the Defendant reasonable and adequate time to cure their regulatory violation in not keeping and referring to the mandatory FAA safety manuals.

48. The Defendant engaged in retaliatory personnel action in suspending the Plaintiff guised as a "fit for duty" evaluation and encumbering him with an approximate $1,800 garnishment of wages upon his return (*Id.* **Exhibit "C"**).

**WHEREFORE** the Plaintiff, Mark C. Butterfield, by and through undersigned counsel, demands judgment for compensatory damages in excess of $15,000.00, included interest on all liquidated damages, retroactive compensation and protection of such thereof, accelerated indebtedness damages, damages to benefits of insurance, healthcare and the like, future damages in the proximate cause of mental anguish, unwarranted monetary penalty, unwarranted garnishment of wages, restricting earning capacity, non-economical damages, attorney's fees to any applicable offer of judgment statute and/or

rule, taxable costs against the Defendant JetBlue, applicable exemplary damages and further demands trial by jury of all issues so triable as a matter of right by jury.

## COUNT II: VICARIOUS LIABLITY- DEFAMATION

49. Plaintiff repeats and re-alleges paragraphs 1 through 48 stated as if set forth in full.

50. At all times material, Debra Heslin, Giovani Quintero, Alfred Alvarez and Ariene Daley are employed by Defendant, JetBlue Airways Corporation, within the capacity of establishing actual and/or apparent agent authority. Debra Heslin, Giovani Quintero, Alfred Alvarez and Ariene Daley engaged in conduct within the scope of their employment described herein.

51. The Plaintiff had no complaints, discrepancies, or reprimands within the approximate eight (8) years of employment with the Defendant.

52. The "letters of concern" were published or caused to be published by the Defendant's supervisory staff, were read in circulation via e-mails and furnished to third parties.(*Id.* **Exhibit "B"**)

53. The statements are purely based on self-speculation and distortion in the allegations against the Plaintiff.  The Defendant knew or should have known that the statements were and are false.

54. All statements made in the "letters of concern" misrepresented the Plaintiff in his merits as a person, as an employee, his mental health and the like, to himself and his peers.

55.  The Defendant, JetBlue Airways Corporation, is liable for the wrongful conduct of Debra Heslin, Giovani Quintero, Alfred Alvarez and Ariene Daley actions under the law of vicarious liability, including the doctrine of *respondeat superior*.

56. As a direct result of these "letters of concern", its publication, and causation to be read by third parties, the Plaintiff's personal and professional reputation is severely damaged.

**WHEREFORE** the Plaintiff, Mark C. Butterfield, by and through undersigned counsel, demands judgment for compensatory damages in excess of $15,000.00, included interest on all liquidated damages, retroactive compensation and protection of such thereof, accelerated indebtedness damages, damages to benefits of insurance, healthcare and the like, future damages in the proximate cause of mental anguish, unwarranted monetary penalty, unwarranted garnishment of wages, restricting earning capacity, non-economical damages, attorney's fees to any applicable offer of judgment statute and/or rule, taxable costs against the Defendant JetBlue, applicable exemplary damages and further demands trial by jury of all issues so triable as a matter of right by jury.

## COUNT III: VICARIOUS LIABLITY- NEGLIGENT MISREPRESENTATION

57. The Plaintiff repeats and re-alleges paragraphs 1 through 56 stated as if set forth in full.

58. At all times material, Debra Heslin, Giovani Quintero, and Alfred Alvarez are employed by Defendant, JetBlue Airways Corporation, within the capacity of establishing actual and apparent agent authority. Debra Heslin, Giovani Quintero,

Alfred Alvarez and Ariene Daley engaged in conduct within the scope of their employment described herein.

59. Heslin, Quintero, and Alfred Alvarez misrepresented to the Plaintiff that the agreed April 6, 2012 meeting was to inform him of his safety inquires. The true nature of the agreed arranged meeting was to secure the Plaintiff's removal of duty. (*See* **Exhibit "D"**)

60. The Plaintiff relied on the agreed arrangement to clarify his concerns and instead was presented with the Defendant's forced procedure to remove the Plaintiff from duty. The Plaintiff, bombarded with this procedure, did not have time or the option to understand or refute the situation he was placed in.

61. The Defendant is liable for the wrongful conduct of Heslin, Quintero, and Alfred Alvarez's intentional and knowingly overreach of material fact in inducing Plaintiff by trickery, concealment, and misrepresentation to formally remove the Plaintiff from duty.

62. Of the Plaintiff's reliance upon the Defendant's misrepresentation, the Plaintiff loss one (1) year of his earning capacity, benefit packages, and incurred accelerated indebtedness.

**WHEREFORE** the Plaintiff, Mark C. Butterfield, by and through undersigned counsel, demands judgment for compensatory damages in excess of $15,000.00, included interest on all liquidated damages, retroactive compensation and protection of such thereof, accelerated indebtedness damages, damages to benefits of insurance, healthcare and the like, future damages in the proximate cause of mental anguish, unwarranted monetary penalty, unwarranted garnishment of wages, restricting earning capacity, non-

economical damages, attorney's fees to any applicable offer of judgment statute and/or rule, taxable costs against the Defendant JetBlue, applicable exemplary damages and further demands trial by jury of all issues so triable as a matter of right by jury.

Dated: 12 day of July, 2015

Respectfully submitted,

By: **/s/ Michael Moulis**
Michael Moulis
FBN: 186790
Attorney for the Plaintiff
Moulis Aviation Law
Office,P.A.
1100 Lee Wagener Blvd.
Suite 101
Ft. Lauderdale, FL 33315
Tel: 954.727-3255
Fax: 954.737-0915

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing has been electronically furnished on this 16 day of July, 2015 to all respective parties and counsel via the Florida Court's Electronic Service through the Florida Court E-filing Portal.

By: /s/ Michael Moulis
Michael Moulis
FBN: 186790

# EXHIBIT

## A

3 Feb 12

'lt 1 JFK-FLL

1. After boarding the FA1 informed me that he was having problems with a female passenger.
2. FA1 stated that the passenger indicated to him that she had a medical issue and when he tried to follow up with her on the issue she put her hand up dismissively with her shirt up against her mouth and refused to discuss it.
3. I told him we would inform the GSC
4. The female gate agent GSC came onboard and spoke with the female passenger.
5. After the female gate agent GSC had a conversation with the female passenger the passenger approached the FO who was in the galley and asked to speak to someone in charge.
6. The FO informed me that the female pax wanted to speak to me.
7. The female pax was in the galley and I was standing next to the fwd restroom door. I asked her if I could help her.
8. Female pax stated that she wanted to speak in private. I stepped back two steps into the cockpit and she stood by the fwd lav door.
9. I could tell from first contact and her demeanor that she was not a person who was capable of interaction with other people in a socially appropriate manner. (a member of the lunatic fringe)
10. She stated that she had an extreme sensitivity to odors and that she smelled something. She said when she spoke to the flt attendant he made a big deal about it.
11. I started to explain to her that the flt attendant informed me that she stated she had a medical issue and that she blew him off. She stated that the FA1 was not truthful and that she did not have a medical issue she was just sensitive to odors. She wanted to know what the smell was.
12. Note: it smelled like vinegar in the jetway, I assumed it was recently cleaned.
13. I explained to her that since she indicated that she has a medical condition and appeared to be distressed that she would have to resolve it with the Ground Security Coordinator who would discuss it with her.
14. She went to "cover up mode" and contradicted her earlier statement to me and stated that she didn't try to blow off the FA1 that she had a cold and was covering her mouth while she was speaking to her friend next to her. She stated that either the FA1 or the female GSC was "rude for interrupting her while she was trying to speak to a friend next to her"
15. I advised her that the Ground Security Coordinator would be discussing her medical status with her to determine if it was safe for her to fly.
16. The female passenger advised me that it was against the law to discriminate against people with medical disabilities (implying that she had a medical disability). I asked her if she had a medical disability issue that we were not aware of and she stated 'no". She then took a breath and stated "as soon as we land I'm going to file a complaint".
17. Jetblue security person "Andy" arrived at the the doorway while the passenger was still beside us. He asked me what was going on. I advised him that this passenger either has a medical issue or doesn't have a medical issue. She interrupted and said "I am fine I don't have a medical issue" while standing there with her shirt around her mouth.
18. Andy took the lady out into the galley. He then came into the cockpit and asked me what I thought. I told him that I think she is trouble. She appeared to me to be mentally disturbed and to be trying to set us up for some time of legal suit. I stated that she indicated to the FA1 and to me that she had a medical issue and then lied and stated that she did not have a medical issue.

19. He asked me if we should take her off the plane. I stated that on the ground that is his call but that she stated to my FA1, to the female GSC, and to me that she has a medical issue enough to have to bring it up to a crewmember and that it would seem to be negligent on our part to take her on a three hour flight without insuring that she is medically safe to fly. I also said she lied to every crew member she has come in contact with  making legal sounding statements that may be an indicator of a plan to file a frivolous lawsuit. I suggested that we follow our GSC guidelines and that he take her off, check her condition with medlink, and try to get her on the next possible flight if it is deemed appropriate.

20. FA1 later reported to me that as the passenger was being escorted off the plane she twice threatened him. Lunatics like that need to be banned from flying on Jetblue.

21. I think the FA1 made a good call on this passenger. I think he realized that she is the type of individual who is unstable, unable to control her abnormal and antisocial behavior, and creates a conflict then reverses the blame onto everyone else. He even sensed that it would only escalate once in flight. The passenger even admitted that she was going to file a complaint. I think the FA1 and many other flight attendants are cautious about taking passengers like this on a flight who are clearly going to create a disturbance and then complain because they think they will either get a free ticket or money. Flight Attendants know that they are often written up by this type of person and that the FA management side fires flt attendants or puts them on disciplinary status, progressive guidance, etc merely on the word of a passenger who may even be nuts. I support the actions of the FA1, the female GSC, and Andy the GSC and I think they are to be commended for the calm, professional way that they analyzed the situation and took appropriate action to protect the employees and company.

Captain Larry Toigo
2941          FLL

Author: Butterfield, Mark
Date/Time: 2012-02-13T10:10:00-05:00
Tail No:
Flight No: 1
Aircraft Type: A320-232,
Departure: JFK
Destination: FLL

Event Facts/Concern Description: Passenger ▮▮▮▮▮▮ (1C) was acting very loud and very strange the moment she entered the aircraft. Immidiately she said loudly "Oh, what's that horrible smell?" She was looking at me like she wanted an answer, I told her I smelled nothing out of the ordinary and everything seemed to be fine. She kept going on and on about the smell in a loud voice and was starting to involve the other passengers around her. She was holding her shirt up to cover her nose and mouth and was acting erratic. I asked her if she was ok and if she had a concern for her health or safety. She replied to me "I'm worried about YOUR safety". I asked her why and she responded "because of that terrible SMELL!". At this point I really started to question to myself if she was mentally stable. I asked further about her concern and she stated that she had a medical condition that would react to odors. I told her that I was going to have someone come and talk to her to make sure she was ok. She said "You can't do that! Sick people can't fly? That's discrimination and I have witnesses!". She then said "I want to talk to my friends here, IF THAT'S OK WITH YOU!" and dismissed me as if I were not permitted to speak to her.
At this point I spoke with the gate agent about her and asked if shev would speak with her. The gate agent approached her and asked if she was ok. She yelled at the gate agent "YES!! YES I AM OK!!! DON"T YOU SPEAK ANY ENGLISH!!?". At this point the gate agent and I decided that her behavior was so inappropriate that perhaps it was best if she not take this flight. The gate agent called the GSC on the radio to come deal with her.
Once the GSC came, she created yet more of a scene demanding to speak to who was in charge. She spoke with both the Captain and the GSC. The decision was made in the cockpit between the Captain, the GSC, and myself to have her removed.
Throughout the whole ordeal with various people, she was using words that would imply the threat of a lawsuit. On her way off of the plane she threatened me two separate times.
Passenger ▮▮▮▮▮ was a witness to the event and wrote the following statement:
"Passenger in seat 1C - started to complain about a terrible odor that she was having a reaction to. She started to act anxious, holding her throat. She opened all the A/C vents in her row, the row next to her, and row 2 "to get more air, she is having a reaction to this odor", Mark, flight attendant asked for her concern if she was allright if she had concern for the aircraft, safety, or her health. She would not answer him. She war rude, belligerent, and dismissive. He explained his concern was for her & 150 passengers and we wouldn't take off until he was sure she was ok. She would not cooporate and finally she am ok don't you speak english. Mark was professional throughout. She stated her rights were violated - they were not."

:

## JEMS Report Received - SRC89-12

SafetyReports@jetblue.com [SafetyReports@jetblue.com]

**Sent:** Wednesday, March 28, 2012 12:02 PM

**To:** Butterfield, Mark

Dear Mark,

Thank you for submitting your JEMS report. Your report was received and is being processed. Your report has been assigned the following tracking number: SRC89-12.

Should you have any urgent questions contact the Safety Hotline at 866-530-8470.

A copy of your report is listed below.

*** Please be advised that this message has been sent automatically from an unmonitored account. Do not attempt to respond to this e-mail. ***

_____

eReport ID: SRC89-12

Author: Butterfield, Mark
Date/Time: 2012-03-23T12:20:00-04:00
Tail No:
Flight No: 376
Aircraft Type:
Departure: FLL
Destination: LGA

Event Facts/Concern Description: On Feb. 13 passenger ▇▇▇▇▇▇▇▇ was removed from flight #1 JFK-FLL for loud, anxious, and disrupive behavior. As she was being removed by Blue Watch, she threatened me twice, as stated in my IIR eReport ID: IPR571-12. I was the FA#1.

On March 23, the same passenger boarded my flight #376, FLL-LGA. As she had threatened me only 1 month ago on a previous flight, I wanted to know if this passenger had been dealt with in any manner as a result of my IIR report. I was unable to obtain any information as to any disciplinary or preventative action that may have been given to her as a result.

I was also the #1 on this flight. My only option was to change positions in order to avoid contact with this passenger, who was seated in 1B. I remained in the back portion of the aircraft for the entire flight in order to avoid any contact with the passenger. I feared for my safety.

Recommendation:

## Safety Concern Report - SCR 89-12



Packer, Joshua

**Sent:** Friday, March 30, 2012 12:56 PM
**To:** Butterfield, Mark

Dear Mark,

Thank you for taking the time to submit your previous Safety Concern Report. Your input on JetBlue's operation is valuable. Safety Concern Reports are used to report unresolved issues that you feel might increase the risk of injury, damage or general safety of flight that are systemic in nature. As such, Safety Concern Reports are kept confidential and distribution limited to the Safety Department only. Any Safety Concern will be de-identified prior to being sent to anyone outside of the Safety Department to protect the confidentiality of the submitter.

Based on the circumstances of this event and in order to better process your report, it appears an irregularity report may be more appropriate. This allows immediate distribution to the appropriate operating department/individuals and will be better handled in our database in order to identify any possible systemic issues.

With your permission, we can convert this report to an irregularity report on your behalf and no further action will be required. If you feel this is a true safety concern and want your report to remain as is, please let us know and no change will be made to your report.

If you have any questions or comments, feel free to send an email to JEMS@jetblue.com.

Regards,

████████████

Flight Safety Co-op
JetBlue Airways
8265 Hangar Blvd.
Orlando, FL 32827
████████████

# EXHIBIT

# B

| | |
|---|---|
| **From:** | Heslin, Debra |
| **To:** | Ahmers, Alfred |
| **Subject:** | Fwd: Mark Butterfield |
| **Date:** | Wednesday, March 28, 2012 7:47:56 PM |

FYI.

Begin forwarded message:

> **From:** "Daley, Arlene" <Arlene.Daley@jetblue.com>
> **Date:** March 28, 2012 7:44:45 PM EDT
> **To:** "Quintero, Giovanni" <Giovanni.Quintero@jetblue.com>
> **Cc:** "Heslin, Debra" <Debra.Heslin@jetblue.com>
> **Subject: Mark Butterfield**
>
> Hello Giovanni,
>
> On Monday March 26, 2012 at approximately 1730 Mark Butterfield came into the office to speak to Deb. He stopped by my desk and I told him she was expecting him so to please go ahead. Deb's door was closed but I could hear Mark's voice from where I sat, however I could not say what exactly he was saying. He was speaking loudly and so I looked through the glass window to see if Deb was still at her desk and she was, but I chose to remain in the office until Mark left because the conversation did not seem to be going well.
>
> After Mark left the office I asked Deb if she was okay and she said "yes" but she was visibly shaken by the interaction that she had with Mark.
>
> If I can be of any further assistance, please do not hesitate to contact me.
>
> Sincerely,
>
> *Arlene P. Daley*
> Arlene P. Daley
> Inflight Supervisor - FLL
> JetBlue Airways
> ████████████
>
> Fort Lauderdale, Florida 33315
> Tel: ████████ Mobile: ████████
> Fax: ████████
>
> YOU ABOVE ALL
> **jetBlue**

| | |
|---|---|
| **From:** | Heslin, Debra |
| **To:** | Alvarez, Alfred |
| **Subject:** | RE: Mark Butterfield |
| **Date:** | Friday, March 30, 2012 10:07:46 AM |

Hi Alfred,

Thank you for getting back to me. I will only be in the office today until 1 PM. However, I spoke with Glo last night and this is his statement below. Mark's behavior has only been of recent (perhaps the last few months). He has never been on P.G. and has numerous compliments in his file. He has one complaint of recent. It is this new behavior that has everyone concerned and the way he acted the other day has me concerned also.

I cannot guarantee his safety at JetBlue and I am not sure how to proceed with that discussion because I am unsure how he will react to me saying anything.

What are your thoughts? Someone has to get back to him soon as he will be back in asking what is being done.

Deb

Glo's statement:

On 3/21/12 IFC Mark Butterfield approached me and asked if I had a minute. I said sure and asked him to meet me in the inflight conference room. We talked about his current dependability and advised me that in his most recent visit to see his Dr. he was told that he will have to stay on a particular medicine and that it would probably best to request FMLA since it will have some side effects. One week prior to our meeting was able to observe Mark in the Crew lounge bursting out loud with laughter and talking to himself. Another inflight CM present at the time ▮▮▮▮▮▮ asked him if he was OK. Prior to our meeting, I have noticed a change in Mark's behavior which raised concerns, but I gave him the benefit of the doubt. During my meeting with Mark on 3/21 I noticed the same behavior which was anxious, pupils dilated, and very nervous. He focused his discussion on the FMLA subject and asked me if I will have a difference of opinion on him by being on FMLA and that if our relationship will change because of it. I explained to Mark that our Crewleader to Crewmember relationship will not be affected and that I will continue to support him the same way I support any Crewmember on my team. He insisted that he was not just like everyone else and that he did not want to lose the open relationship we had had in the past years as a member of my team. During the discussion I noticed Mark continue to display an unusual behavior as if he was very anxious and nervous at the same time. He said he wanted to keep me in the loop of what was going on in his life and asked me other questions regarding the use of FMLA. I responded by saying that due to HIPPA Laws we had no involvement in the process and that any questions should be directed to our Benefits Department, Sedgwick and his Dr.

Debra Heslin

March 26, Mark Butterfield called the office to request a meeting with me before his turn that evening. Shortly thereafter, he emailed a JEMS report outlining an incident on February 13, 2012 in which he had an issue with a Customer ███████████ (1C) and had her removed from the flight due to the fact he stated that she had threatened him. {Safety Report Below}

Mark came into the office sweating profusely and seemed very agitated. He started off by thanking me for seeing him today and said he was going to get straight to the point. He said he trusted me and was thrilled I was back in FLL as the Base Manager and he knew he could talk to me and that I would help him. I told him I was happy that he trusted me and I would be there to support him as I would any other Crewmember. I then asked him to tell me what he needed my help with.

At first, it took a little while to understand what the issue was as this as he was "all over the place with the story." Mark then stated that he needed to be supported and his safety was very important and he was threatened what was JetBlue doing about his safety? I asked him to explain.

Mark then stated that a few days earlier this same customer was on his flight. He was very upset and wanted to have the Customer taken off the aircraft. The Customer had not done anything warranting being taken off the aircraft. The customer service agent ███████████ and the pilot, Larry Tolgo, were onboard. The CA stated to him that the Customer had not done anything to be taken off this flight and that Mark could be replaced if he did not want her onboard. The customer service agent wanted to close the boarding door to have the flight leave on time, Mark said he felt pressured and agreed to work the #3 position and change positions with the #1. The Customer was seated in the front so flying in the back was okay for him.

I told him that he did the right thing in that he used his resources and changed positions and his crew supported him throughout the flight. He did not say he had any interaction with this Customer on board nor was there an instance that arose because of it. Mark stated he stayed in the back as he "felt threatened" by her being on board but he did not say how he felt threatened. I tried to pursue why as nothing had happened but he got extremely agitated.

He then started yelling and saying that's not the issue I need to feel safe, what is JetBlue doing about my safety? How do I feel safe, I need to know that I am safe! He stated he called BlueWatch to find out what they did to this customer and that he did not feel safe and what were we doing to protect him from this person. He continued saying the same thing over and over again getting very agitated, sweating and his eyes were bulging.

I told Mark that I would research for him and follow up but that I could not give him any information at this time.

During the entire time, Mark became more and more agitated and raising his voice, at times shouting, his eyes wide, and kept insisting that JetBlue needed to keep him safe and what were we doing to keep him safe. He needed to be guaranteed his safety at work.

I was not comfortable delving further into why he felt this way as I was taken back by his behavior and was not sure how he would react to my saying anything further.

Arlene Daley witnessed the yelling from the office and when Mark left asked if I was okay as she had never heard a loud voice coming from my office before.

Although Mark kept telling me he was not yelling at me or mad at me, he did not want to hear or listen to anything other than the fact he wanted to be kept safe.
Debra Heslin, Manager, Inflight Service FLL

# EXHIBIT

# C



**jetBlue AIRWAYS**

JetBlue Airways Corporation
27-41 Queens Plaza North
Long Island City, NY 11101
Phone number : 1-800-314-1922

*2013*

| Name: | Mark Butterfield | | Filing Status | No. of Exemptions | Additional Withholdings | | Type of Pay: | Manual check |
|---|---|---|---|---|---|---|---|---|
| ID#: | | FED | Single | 01 | 0.00 | | Pay period: | 12/31/2013 - 12/31/2013 |
| Address: | | FL | | 00 | 0.00 | | Pay Date: | 12/31/2013 |
| | | | | | | | PTO balance: | 2.39 |

| Summary | Gross Earnings | Tax Exempt Items | Tax Withholdings | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current Amount | 316.55 | 0.00 | 0.00 | 0.00 | 0.00 |
| YTD Amount | 25,739.71 | 1,923.26 | -4,958.66 | -8,500.62 | 13,887.14 |

| Earnings | Hours | Rate | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Gross Earnings** | | | | |
| Regular Pay | | | | 12,842.92 |
| Inflight Coach | | | | 11.24 |
| Premium Pay | | | | 8,448.99 |
| Office Day/Flight Group18 | | | | 18.00 |
| Pay adjustment | | | | -1,351.26 |
| Electronic Learning | | | | 66.08 |
| Inflight Night Override | | | | 5.32 |
| International Debrief Pay | | | | 2.00 |
| F1 Pay | | | | 137.90 |
| Pay for Performance | | | | 74.24 |
| Profit Sharing Payout | | | | 152.59 |
| CSPP | | | 316.55 | 316.55 |
| Holiday Pay | | | | 138.32 |
| PTO | | | | 4,619.11 |
| Adj. Taxable Per Diem | | | | 29.27 |
| Taxable Per Diem | | | | 228.44 |
| Taxable Per Diem | | | 316.55 | 25,739.71 |
| | | | | |
| **Tax Exempt Items** | | | | |
| NonTax Per Diem not taxed | | | | 1,921.61 |
| CSPP EE Refunds | | | | 1.65 |
| | | | | 1,923.26 |

| Tax Withholdings | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| FED Withholding Tax | | | | -3,060.31 |
| FED EE Social Securi | | | | -1,538.53 |
| FED EE Medicare Tax | | | | -359.82 |
| | | | | -4,958.66 |

| Deductions | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Pre-tax Deductions** | | | | |
| Med United pre | | | | -497.50 |
| Dental EE pre | | | | -110.63 |
| 401K pct EE pre | | | | -1,496.31 |
| | | | | -2,104.44 |
| **Post-tax Deductions** | | | | |
| 401k Loan 1 Ded | | | | -3,803.45 |
| STD Voluntary EE post | | | | -175.83 |
| CSPP EE post | | | | -2,416.90 |
| | | | | -6,396.18 |
| **Total Deductions** | | | | -8,500.62 |

| Payment Details | Bank | Account | Check No. | Amount |
|---|---|---|---|---|
| | | | | |

**jetBlue**
**AIRWAYS**

JetBlue Airways Corporation
27-01 Queens Plaza North
Long Island City, NY 11101
Phone number: 1-800-314-1922

| Name: | Mark Butterfield | | | Filing Status | No. of Exemptions | Additional Withholdings | | Type of Pay: | Regular |
|---|---|---|---|---|---|---|---|---|---|
| ID#: | | | FED | Single | 01 | 0.00 | | Pay period: | 02 (01/01/2014 - 01/15/2014) |
| Address: | | | FL | | 00 | 0.00 | | Pay Date: | 01/21/2014 |
| | | | | | | | | PTO balance: | 7.56 |

| Summary | Gross Earnings | Tax Exempt Items | Tax Withholdings | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current Amount | 1,294.41 | 405.33 | -228.15 | -445.70 | 1,025.89 |
| YTD Amount | 5,091.84 | 405.33 | -1,159.59 | -1,329.36 | 3,008.22 |

| Earnings | Hours | Rate | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Gross Earnings** | | | | |
| Regular Pay | 35.00 | 34.58 | 1,210.30 | 1,979.01 |
| Premium Pay | | | | 2,394.84 |
| Pay adjustment | | | -150.14 | -300.28 |
| Inflight Night Override | | | | 4.85 |
| F1 Pay | | | | 35.00 |
| Pay for Performance | | | 148.48 | 148.48 |
| Holiday Pay | | | | 302.58 |
| PTO | | | | 441.59 |
| Adj. Taxable Per Diem | 205.75 | 0.03 | 6.17 | 6.17 |
| Taxable Per Diem | 39.80 | 2.00 | 79.60 | 79.60 |
| Total Gross Earnings | | | 1,294.41 | 5,091.84 |
| **Tax Exempt Items** | | | | |
| NonTax Per Diem not taxed | 205.75 | 1.97 | 405.33 | 405.33 |
| Total Tax Exempt Items | | | 405.33 | 405.33 |

| Tax Withholdings | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| FED Withholding Tax | | | -133.41 | -778.63 |
| FED EE Social Securi | | | -76.78 | -308.75 |
| FED EE Medicare Tax | | | -17.96 | -72.21 |
| Total Tax Withholdings | | | -228.15 | -1,159.59 |

| Deductions | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Pre-tax Deductions** | | | | |
| Med United pre | | | -47.50 | -95.00 |
| Dental EE pre | | | -8.51 | -17.02 |
| 401K pct EE pre | | | -63.61 | -291.46 |
| Total Pre-tax Deductions | | | -119.62 | -403.48 |
| **Post-tax Deductions** | | | | |
| 401k Loan 1 Ded | | | -205.55 | -411.10 |
| STD Voluntary EE post | | | -14.51 | -29.02 |
| CSPP EE post | | | -106.02 | -485.76 |
| Total Post-tax Deductions | | | -326.08 | -925.88 |
| **Total Deductions** | | | -445.70 | -1,329.36 |

| Payment Details | Account | Check No. | Amount |
|---|---|---|---|
| JetBlue Payroll Direct Deposit | ******7213 | | 1,025.89 |

# jetBlue
## AIRWAYS

JetBlue Airways Corporation
27-01 Queens Plaza North
Long Island City, NY 11101
Phone number : 1-800-314-1922

| Name: | Mark Butterfield | | | Filing Status | No. of Exemptions | Additional Withholdings | Type of Pay: | Regular |
|---|---|---|---|---|---|---|---|---|
| ID#: | | | | | | | Pay period: | 03 (01/16/2014 – 01/31/2014) |
| Address: | | | FED | Single | 01 | 0.00 | Pay Date: | 02/07/2014 |
| | | | FL | | 00 | 0.00 | PTO balance: | 1.43 |

| Summary | Gross Earnings | Tax Exempt Items | Tax Withholdings | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current Amount | 986.50 | 0.00 | -144.22 | -433.91 | 408.37 |
| YTD Amount | 6,078.34 | 405.33 | -1,303.81 | -1,763.27 | 3,416.59 |

| Earnings | Hours | Rate | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Gross Earnings** | | | | |
| Regular Pay | 20.52 | 34.58 | 709.58 | 2,688.59 |
| Premium Pay | | | | 2,394.84 |
| Pay adjustment | | | -150.14 | -450.42 |
| Inflight Night Override | | | | 4.85 |
| International Debrief Pay | 1.00 | 2.00 | 2.00 | 2.00 |
| F1 Pay | 11.10 | 2.00 | 22.20 | 57.20 |
| Pay for Performance | | | | 148.48 |
| Holiday Pay | | | | 302.58 |
| PTO | 11.65 | 34.58 | 402.86 | 844.45 |
| Adj. Taxable Per Diem | | | | 6.17 |
| Taxable Per Diem | | | | 79.60 |
| *Total Gross Earnings* | | | 986.50 | 6,078.34 |
| **Tax Exempt Items** | | | | |
| NonTax Per Diem not taxed | | | | 405.33 |
| *Total Tax Exempt Items* | | | | 405.33 |

| Tax Withholdings | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| FED Withholding Tax | | | -73.04 | -851.67 |
| FED EE Social Securi | | | -57.69 | -366.44 |
| FED EE Medicare Tax | | | -13.49 | -85.70 |
| *Total Tax Withholdings* | | | -144.22 | -1,303.81 |

| Deductions | | | Current Amount | YTD Amount |
|---|---|---|---|---|
| **Pre-tax Deductions** | | | | |
| Med United pre | | | -47.50 | -142.50 |
| Dental EE pre | | | -8.51 | -25.53 |
| 401K pct EE pre | | | -59.19 | -350.65 |
| *Total Pre-tax Deductions* | | | -115.20 | -518.68 |
| **Post-tax Deductions** | | | | |
| 401k Loan 1 Ded | | | -205.55 | -616.65 |
| STD Voluntary EE post | | | -14.51 | -43.53 |
| CSPP EE post | | | -98.65 | -584.41 |
| *Total Post-tax Deductions* | | | -318.71 | -1,244.59 |
| **Total Deductions** | | | -433.91 | -1,763.27 |

| Payment Details | Account | Check No. | Amount |
|---|---|---|---|
| JetBlue Payroll Direct Deposit | *****7213 | | 408.37 |

# EXHIBIT

# D

## RE: IIR Response

**Butterfield, Mark**

**Sent:** Wednesday, April 04, 2012 2:03 PM
**To:** Heslin, Debra

I recieved Gio's message and I will be in touch with him as soon as I am able. I have an extremely busy day today and will not have extra time to travel to the airport. I am willing to come in early prior to an upcoming work report time if we are able to meet then. I will try to coordinate this with him.

At the time of our discussion, Gio was out of office which is why I came to you. As of the discussion 3/26/12 that I had with you, I am requesting a response as to the events of 376 FLL-LGA on March 23. As per our discussion you told me you were going to reach out for a response. At this time I am asking what response has been recieved. I will be contacting Gio shortly.

Thank you.


**From:** Heslin, Debra
**Sent:** Wednesday, April 04, 2012 1:18 PM
**To:** Butterfield, Mark
**Subject:** RE: IIR Response

Hi Mark,


Gio left a message with you about an hour ago as we would like you to come into the office today so we can follow-up with you regarding your concern.


Can you confirm to make it in today?  I will tell Gio to reach out to you again on your phone.  He left a message for you.  You can reach Gio at ▮▮▮▮▮▮▮▮


Thanks Mark.


Deb




Debra Heslin

Manager, Inflight Service FLL

JetBlue Airways Corporation


https://blueconnect.jetblue.com/owa/,DanaInfo=mail.jetblue.com,SSL+?ae=Item&t=IPM.N...    4/8/2012





April 6, 2012

Mark Butterfield

Dear Mark,

We are very concerned about you, your well-being, and your abilities to care for our Customers in such a safety sensitive position. You are being removed from duty today April 6, 2012, due to concerns regarding your fitness for duty.

As discussed on April 6, 2012, you are required to complete a fitness for duty evaluation with Dr. Thomas Faulkner. He is an independent contractor that we utilize to facilitate the fitness for duty evaluation to ensure confidentiality, expertise and objectivity. The fitness for duty evaluation will be paid for by JetBlue. Effective April 6, 2012, you are removed from flight status and will be pay protected for your trips until the completion of the fitness for duty evaluation. The fitness for duty evaluation will determine whether or not you will be fit to fly. If you are deemed fit to fly, you will immediately be placed back on the line. If you are not deemed fit to fly, you are able to choose the following options moving forward:

- Apply for a non-safety sensitive position, or
- Substantiate your leave through one of JetBlue's time off programs and complete the return-to-work plan Dr. Faulkner recommends while on a substantiated leave of absence.

If you select an approved leave of absence and it has ended, you will be required to complete the necessary return to work paperwork and be cleared to return by Dr. Faulkner.

As discussed, Dr. Faulkner will be in touch with you to coordinate the details of your fitness for duty evaluation. His contact number is ▆▆▆▆▆. Also, if you have any questions about this process, please contact me. If you have any questions regarding your pay, return to work or schedule; please contact your Crewleader.

Mark, please know that JetBlue values you and supports you during this process.

Sincerely,

Alfred Alvarez
Field Generalist Southeast and Caribbean
JetBlue Airways

Cc:      Debra Heslin, Manager Inflight Service

# EXHIBIT "B"

**From:** Butterfield, Mark
**Sent:** Friday, October 12, 2018 3:03 PM
**To:** Mendez, Marilyn <Marilyn.Mendez@jetblue.com>
**Subject:** Investigation

Hello Marilyn,

---

I just tried calling you and received the voice mail system. This correspondence serves as a follow up to the meeting we had in person this morning. I wanted to make you aware that when I spoke with Tobias from jetBlue Crew Relations on September 20, he did not mention anything about an investigation. This morning is the first that I have been made aware of an investigation proceeding which is another reason why I was very surprised at the impromptu nature of this meeting.

Additionally, out of fairness I want to make you aware that the attorney representing jetBlue has stated that jetBlue intends to find a way to terminate my employment and will seek any method necessary to do so. It is directly due to this statement that I am hesitant to be subject to a line of questioning. The subject matter that you want to discuss comes directly from this same attorney, and she is the reason that this investigation has begun.

It is my understanding that this investigation is taking place in a retaliatory manner, and also that it is illegal. Notwithstanding, I will cooperate with this investigation. As I mentioned this morning, it is my intent to cooperate in accordance with jetBlue policy.

Thank You,

Mark Butterfield

# EXHIBIT "C"

# Re: Investigation

## Butterfield, Mark

Thu 10/18/2018 4:16 PM

Sent Items

To: Mendez, Marilyn <Marilyn.Mendez@jetblue.com>; Austin, Jeffrey <Jeffrey.Austin@jetblue.com>; Darrow, Carol <Carol.Darrow@jetblue.com>;

Cc: Bushway, Tobias <Tobias.Bushway@jetblue.com>;

**Statement:**

Please note that I am including my immediate Supervisor, Jeff Austin in this statement, as he has not been spoken to or made aware of any actions regarding jetBlue People Department and myself taken since 9-20, nor is he aware of my current status of being placed on suspension.

On September 20, 2018 I recieved a phone call from the jetBlue People Department and spoke with Tobias Bushway. He asked me about a "manifest that was in my posession". I told him that I did not have a manifest in my posession.
October 12, 2018 FLL Inflight supervisor Carroll Darrow came aboard my scheduled flight prior to boarding and told me that the jetBlue People Department wanted to speak with me and were waiting for me in the Inflight office. I deplaned and accompanied her to the office during which time she told me that the representative from the people department stated to her that they have tried to reach me "multiple times" and were unsuccessful. I was only contacted once.

People Department representative Marilyn Mendez proceeded to ask me questions and began with the wording "your attorney". I immediately told her that this is an "ongoing litigation" and used that term with her several times, yet she continued to attempt to ask various questions in the same light as what I had already answered previouisly on 9-20. I offered to provide her with the name and contact information of my attorney. She declined. I asked her if it was permissable for my attorney to be present during our meeting. Her reply was no.

I did not respond to any questions she attempted to ask, nor did I engage in any discussion in regard to my attorney or any case pending.

At approximately 2:52 pm on October 18, 2018, Supervisor Carol Darrow called me and verbally explained that I was suspended from my employment at jetBlue Airways. I have not received such notification in writing.

Mark Butterfield

# EXHIBIT "D"

**From:** Mendez, Marilyn
**Sent:** Thursday, October 18, 2018 12:00:08 PM

**To:** Butterfield, Mark
**Cc:** Bushway, Tobias
**Subject:** RE: Investigation

Hi Mark,

Thank you for your below e-mail.

When we met on October 12, 2018, you stated that after receiving a phone call from Tobias, you opted (purportedly under advice of your counsel) not to answer any questions, nor to even return his call. You expressed that you did not think that being pulled off a work trip at 4:30 am was the appropriate course of action. I explained to you that it is normal protocol after attempting to contact a Crewmember via telephone, but not being able to do so due to the Crewmember's lack of response, to remove that Crewmember from a scheduled flight to afford the Crewmember the opportunity to provide a statement in an ongoing investigation. You acknowledged that you were supposed to call Tobias back but failed to do so. You also stated that your attorney would be handling the response to Tobias.

Again, whether you consult with an attorney is your right, but it does not relieve you of your duty to cooperate with our internal investigation, and does not remove your obligation to respond truthfully to our questions. In fact, during our meeting, I reminded you numerous times that cooperating with an internal investigation is a condition of employment and that not complying may result in disciplinary action, up to and including separation of employment. For your reference, you are able to find this information in the Crewmember Blue Book (CBB) Section 2.9. Nonetheless, you still refused to respond to my inquiries. When you refused to answer the questions that I asked, I advised that it would be deemed as not cooperating with the investigation. You stated that you understood JetBlue's policies and that you were comfortable with your actions.

Due to your failure to respond to our investigation, we are moving forward with your suspension from employment, pending an employment review.

Regards,

**Marilyn Mendez, PHR**
JetBlue
**Field Generalist**
FLL Hollywood International Airport
Ft. Lauderdale, FL 33315
P: 954-233-4844

To fly: Call 1-800-JETBLUE or visit www.jetblue.com

# EXHIBIT "E"



Sent via FedEx

11/5/2018

Mark Butterfield
CM ID # 57178
2400 NW 33rd Street
Apartment #1107
Oakland Park, FL 33309

Dear Mark:

Effective today, 11/5/2018, your employment with JetBlue is being separated for Violation of Company Policy.

Please be aware of the following information:

- If you have not already received your final paycheck, it will be distributed to you with any monies due to you by the Payroll department via live check, including any unused, accrued PTO.

- If you still have any JetBlue property, please contact me immediately to arrange for its prompt return.

- Your health benefits cease on the last day of the month of separation. You will receive a separate letter discussing your benefits, and any applicable continuation thereof pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA").

- JetBlue has a post-separation review (PSR) process that may be requested by any separated Crewmember.  If you have extenuating circumstances, or additional information that you would like reviewed, you must contact CrewRelations@jetblue.com within 30 days of separation.
  - Please note, JetBlue does not conduct a PSR for violations of the drug and alcohol policy and failure to complete required training.

- Navigator (866-529-1675), JetBlue's employee assistance program will be available to you and your family members for 90 days following the date of your separation. (Username: Navigator)

If you have any questions please email CrewRelations@jetblue.com.

Sincerely,

Jeffrey Austin
Inflight Team Leader